IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 18-20400-MSN-dkv |
| | ) | |
| ZACHARY FUCHS, | ) | |
| | ) | |
| Defendant. | ) | |

_____

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

_____

On November 15, 2018, the grand jury returned an indictment charging the defendant, Zachary Fuchs ("Fuchs"), with knowingly and intentionally possessing with the intent to distribute fifty (50) grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). (Indictment, ECF No. 1.) The charge arises out of a traffic stop, the subsequent detention of Fuchs, and a search of the vehicle Fuchs was driving. Two officers of the Gallaway Police Department conducted the traffic stop on June 6, 2018 in the parking lot of a business located on Highway 70 in Gallaway, Tennessee. During the search, the officers found 1.1 pounds of methamphetamine behind the vehicle's center console.

Now before the court is Fuchs's January 23, 2019 motion to suppress all evidence, including statements by Fuchs, obtained by law enforcement officers during the June 6, 2018 traffic stop.

(Def.'s Mot. Suppress 8, ECF No. 23.)   The government filed a response on February 6, 2019.  (Gov't's Resp., ECF No. 25.)  The motion was referred to the United States Magistrate Judge for a report and recommendation.  (ECF No. 24.)

Pursuant to the reference, the court held an evidentiary hearing on March 14, 2019.  At the hearing, the government called one witness, Gallaway Police Department Officer David Nabors ("Officer Nabors"), and introduced two exhibits into evidence: (1) the Affidavit of Complaint for Fuchs's arrest, (Aff. Of Compl., Ex. 1); and (2) a disc containing a video of Officer Nabors's body-camera footage during the arrest, (Body-Camera Footage, Ex. 2).  Fuchs did not call any witnesses or introduce any exhibits.

After careful consideration of the statements of counsel, the testimony of the witness, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be denied in part and granted in part.

## I.   PROPOSED FINDINGS OF FACT

Officer Nabors was the only witness who testified at the hearing.  Office Nabors is currently employed at the Hardeman County Sheriff's Office.  At the time of Fuchs's arrest, Officer Nabors was employed with the Gallaway Police Department, where he served as an officer for four years.  Officer Nabors testified

that his duties as an officer with the Gallaway Police Department included seizing narcotics and building narcotics-based cases, which he did with the assistance of his narcotics-detection canine, "Kilo."

On June 6, 2018, at approximately 11:00 a.m., Officer Nabors was running radar near the intersection of Highway 70 and Old Brownsville Road in Gallaway, Tennessee when he noticed a green SUV traveling eastbound without a license plate. While following the vehicle to determine whether it had temporary tags taped in the rear window, the vehicle pulled into the parking lot of Crystal Steel, a steel fabricating company. Officer Nabors followed the vehicle into the parking lot, activated his police-vehicle lights and siren, and initiated a traffic stop in the parking lot. Officer Nabors then exited his patrol car and made contact with the driver of the vehicle, who identified himself as Zachary Fuchs. According to Officer Nabors, when he approached the vehicle, Fuchs was combative, appeared nervous, questioned why he was stopped, cursed, and accused Officer Nabors of stealing his license plate. When asked for identification and other papers, Fuchs admitted that he did not have a driver's license, vehicle registration, or proof of insurance, but he

3

provided Officer Nabors with his social security number.[1] Additionally, Officer Nabors testified that when Fuchs rolled his window down an odor of marijuana emanated from the vehicle. On cross-examination, Officer Nabors admitted that he failed to mention the odor of marijuana in the Affidavit of Complaint, (Aff. Of Compl., Ex. 1), despite his duty to report anything that could potentially justify the search when writing it. Further, Officer Nabors admitted that he did not mention the marijuana odor while questioning Fuchs nor at any point while his body camera was recording.

After initially questioning Fuchs at his vehicle, Officer Nabors called Captain James Mayes ("Captain Mayes") for backup at the scene and returned to his patrol car to call in the information he had obtained. Because Fayette County dispatch was down, he called the El Paso Intelligence Center ("EPIC"). While sitting in his patrol car, Officer Nabors realized that he had mistakenly turned on the flashlight of his body camera instead of turning the camera to the "record" setting. Accordingly, the body-camera footage begins with Officer Nabors sitting in his squad car dialing EPIC.

---

[1] Fuchs has not moved to suppress these statements. Accordingly, the court does not address their admissibility in its analysis.

At the beginning of the phone call with EPIC, Officer Nabors reported that Fuchs was combative and that he did not have any identification information for the vehicle.  Officer Nabors then provided EPIC with Fuchs's social security number, and EPIC informed Officer Nabors that Fuchs previously pleaded guilty to manufacturing and attempting to manufacture over fifty grams of methamphetamine and, in 2004, was sentenced to eight years imprisonment followed by supervised release.  Additionally, EPIC advised that Fuchs was known for carrying a handgun and had previously been charged with stealing a vehicle during the commission of a theft.

While Officer Nabors was speaking to EPIC, Captain Mayes arrived at the scene and approached Fuchs's vehicle.  The body-camera footage shows that shortly after Captain Mayes arrived, Officer Nabors informed EPIC that he observed Fuchs shuffling in his car and reaching under his seat.  In response to Fuchs's behavior and because Captain Mayes did not know that Fuchs was known to carry a firearm, Officer Nabors ended the phone call with EPIC and approached the vehicle to detain Fuchs for officer-safety purposes.

When Officer Nabors approached Fuchs and Captain Mayes, Fuchs was smoking a cigarette and talking on the phone to his girlfriend while sitting in the driver's seat of his vehicle with the door closed and the window rolled down.  Officer Nabors told

5

Fuchs to step out of the vehicle; in response, Fuchs exited the
vehicle and asked if he was under arrest. Officer Nabors
informed Fuchs that he was not under arrest at that time but that
he was being detained so Officer Nabors could talk to him.
Officer Nabors asked Fuchs if he had anything on him, to which
Fuchs responded "no," and proceeded to pat Fuchs down before
handcuffing him. After handcuffing Fuchs, Officer Nabors asked
Fuchs whose car he was driving. Fuchs told the officers that the
vehicle belonged to his girlfriend's acquaintance. Then, Officer
Nabors asked Fuchs if the vehicle was stolen. Fuchs initially
told the officers it was not stolen, but upon further questioning
Fuchs noted that he wasn't completely sure that it was not a
stolen vehicle. Next, Officer Nabors asked Fuchs whether he'd
ever stolen a vehicle before, to which Fuchs stated he had not.
Officer Nabors chuckled at Fuchs's response and continued to
question Fuchs regarding contents of the car, stating the
following:

> "Here's what decides if you go to jail or
> not – it's your honesty. You hear that dog
> barking back there and you see all this on
> my shirt? Is there anything at all –
> whether it be a gram, a kilo, or a pound,
> anything – your honesty is what's going to
> keep you from riding – is there anything at
> all illegal in this car?"

(Body-Camera Footage 15:39:12, Ex. 2.) In response, Fuchs stated
that there "might be half a blunt or something" in the car. (*Id.*

6

at 15:39:28.)  Officer Nabors repeatedly asked whether there was anything else illegal in the car, to which Fuchs replied that there was not.

While Officer Nabors was questioning Fuchs, Captain Mayes examined the door jamb of the driver's door, lifted the hood of the car, and looked under the hood.  On cross-examination, Officer Nabors stated that he couldn't testify as to what Captain Mayes was doing but he believed Captain Mayes was attempting to find a vehicle identification number ("VIN") because they were trying to figure out if the vehicle was stolen.  Officer Nabors noted that the VIN number in the door jamb of the driver's door was painted over or altered in a way that made it impossible to read.  Officer Nabors explained that there is a VIN number on the door, the windshield, and under the hood, and while it is easy to modify or destroy a VIN number on the inside of the driver's door, the VIN number under the hood is more difficult to modify and is usually unaltered.

After closing the hood of the vehicle, Captain Mayes instructed Officer Nabors to move Fuchs's vehicle because it was blocking the entrance to the steel fabricating company and a truck was trying to get by.  While Captain Mayes relocated Fuchs to his squad car, Officer Nabors entered Fuchs's vehicle, rolled up the front windows, and moved the vehicle a short distance on the parking lot.  On cross-examination, Officer Nabors testified

7

that he rolled the windows up to confine the marijuana odor inside the vehicle to create a better chance of his narcotics-detection canine accurately alerting to the presence of narcotics. However, Officer Nabors stated that he did not roll up the windows in the back of the vehicle but would have if he had noticed it was also down.

After moving the vehicle, Officer Nabors retrieved Kilo, a certified narcotics-detection canine trained by Officer Nabors, from the back of his squad car. Officer Nabors testified that Kilo passively alerts to the presence of contraband by sitting, changing his breathing pattern, or generally changing his behavior. Further, Officer Nabors explained that before starting the narcotics-detection process, he must sit Kilo away from the area that potentially contains drugs and command Kilo to begin. On the body-camera footage, Officer Nabors can be heard commanding Kilo to sit several times at the beginning of the process in an attempt to "restart" the procedure.

While walking around the vehicle, Kilo sat down by the driver's side door, which Officer Nabors identified as an alert to the presence of narcotics in that portion of the vehicle. Kilo also jumped on the rear bumper of the vehicle and then calmed down and sat near the rear door of the vehicle, which Officer Nabors identified as another alert to the presence of narcotics. After these alerts, Officer Nabors returned Kilo to

his squad car and began searching the interior of the vehicle. Officer Nabors began his search at the trunk of the vehicle, which did not turn up any contraband items. While searching the passenger compartment, however, Officer Nabors found a plastic bag underneath the driver's seat that contained remnants of a white substance and a roll of packaging tape and plastic gloves in the glove compartment. Officer Nabors continued his search and discovered 1.1 pounds of methamphetamine behind a tray in the dash console. Upon finding the methamphetamine, Officer Nabors returned to the vehicle and began questioning Fuchs again. At no point during the traffic stop or subsequent arrest did either officer read Fuchs *Miranda*[2] rights or obtain a search warrant.

## II.   PROPOSED CONCLUSIONS OF LAW

At the close of the hearing, Fuchs conceded that the initial traffic stop was valid because the vehicle Fuchs was driving did not have a license plate displayed. Fuchs argues, however, that (1) the degree of intrusion during the traffic stop was excessive; (2) Officer Nabors unlawfully searched Fuchs's vehicle when he moved it; and (3) Officer Nabors's testimony regarding the narcotics-detection canine's process for alerting to the presence of drugs is not credible. As a result, Fuchs seeks to suppress all evidence recovered from his vehicle. The government

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

maintains that the search of Fuchs's vehicle was proper under either the automobile exception to the Fourth Amendment or the inevitable discovery doctrine.

Additionally, Fuchs seeks to suppress the statements he made in response to the officers' questioning on the grounds that the officers failed to read him his *Miranda* warnings before questioning him. The government concedes that statements made by Fuchs from the back of the squad car after the methamphetamine was discovered are not admissible, but the government maintains that the statements made before the officers discovered the methamphetamine are admissible because they were made prior to Fuchs's arrest.

A.   The Scope of the Traffic Stop and Excessive Intrusion

A traffic stop is a "seizure" subject to the reasonableness requirement of the Fourth Amendment. *Wren v. United States*, 517 U.S. 806, 809 (1996). "An ordinary traffic stop [] is more akin to an investigative detention rather than a custodial arrest, and the principles announced in *Terry* . . . apply to define the scope of reasonable police conduct." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999)(citing *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996)). Under *Terry v. Ohio*, the reasonableness of an investigative detention is determined under a two-pronged analysis: "whether the officer's action was justified at its inception, and whether it was reasonably related

10

in scope to the circumstances which justified the interference in the first place." 392 U.S. 1, 20 (1968).

In the instant case, Fuchs concedes that the initial stop was valid, but argues that the officers' actions were not reasonably related in scope to the circumstances which justified the stop and were therefore excessive. Specifically, Fuchs contends that removing him from the vehicle and immediately placing him in handcuffs "exceeded the scope of an investigatory stop, and was excessive for the circumstances of a traffic stop." (Def.'s Mot. Suppress 4, ECF No. 23.) The government maintains that Officer Nabors's actions were necessary to preserve the safety of himself and Captain Mayes.

It is undisputed that Officer Nabors initiated the traffic stop after observing Fuchs commit a traffic violation – driving a vehicle without a license plate. Thus, the officers had a reasonable, articulable suspicion that Fuchs was engaged in an unlawful activity and probable cause to stop the vehicle and detain Fuchs. *See Whren,* 517 U.S. 806, 810. The critical issue is whether Officer Nabors's use of handcuffs to detain Fuchs immediately after he exited the vehicle was excessively intrusive.

The reasonableness of law enforcement's actions during a traffic stop depends "on a balance between the public interest and the individual's right to personal security free from

arbitrary interference by law officers." *Pennsylvania v. Mimms*, 434 U.S. 107, 109 (1977).  During a traffic stop, officers may take measures that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Davis*, 331 F. App'x 356, 360 (6th Cir. 2009)(quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)).  When an officer reasonably fears for his safety, he may use handcuffs to detain an individual without transforming the stop into a formal arrest.  *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007)(citing *Houston v. Does*, 174 F.3d 809, 814 (6th Cir. 1999)).

At the hearing, Officer Nabors testified that prior to placing handcuffs on Fuchs, Fuchs was combative and appeared nervous.  While speaking with EPIC, Officer Nabors was informed that Fuchs was known to carry a handgun.  Officer Nabors observed Fuchs making furtive movements and reaching under the seat, which – in conjunction with his earlier encounter with Fuchs – caused Officer Nabors to fear for the safety of Captain Mayes and his own safety and prompted Officer Nabors to detain and handcuff Fuchs.  Based on these events and observations, Officer Nabors's decision to detain and handcuff Fuchs was justified as a safety precaution and was not excessive.

12

B.   Search of the Vehicle

Fuchs next argues that the search of his vehicle was unlawful and does not fall within an exception to the Fourth Amendment's search warrant requirement.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment prohibits warrantless searches and seizures, and any search conducted without a warrant is considered "per se unreasonable." *United States v. Roark*, 36 F.3d 14, 17 (6th Cir.1994)(quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The Fourth Amendment's requirement of probable cause and a warrant is, however, subject "to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357. The burden is on the government to prove, by a preponderance of the evidence, that the circumstances justified a warrantless search. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States v. Bradley*, 163 Fed. Appx. 353, 357 (6th Cir. 2005).

In his motion, Fuchs asserts that when Officer Nabors entered the vehicle and moved it, he conducted an unlawful,

warrantless search of the vehicle in violation of the Fourth Amendment.[3]   (Def.'s Mot. Suppress 5-6, ECF No. 23.)   It is the government's position that Officer Nabors's actions were justified under the automobile exception to the warrant requirement as well as the doctrine of inevitable discovery.   In the alternative, the government contends that moving Fuchs's car to avoid obstructing traffic did not constitute a "search" within the meaning of the Fourth Amendment.

1.   *Automobile Exception*

It is undisputed that after detaining and handcuffing Fuchs, Officer Nabors entered Fuchs's vehicle and moved it.   Under the automobile exception, an officer may perform a warrantless search of a detained vehicle if the officer has probable cause to believe that the vehicle contains contraband or evidence of criminal activity.   *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012).   Probable cause exists when there is a fair probability under the totality of the circumstances that contraband or evidence of a crime will be found in a particular place.   *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003).   "[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on

---

[3] To the extent Fuchs argues that the search commenced when Officer Mayes looked in the door jamb and under the hood, the court finds there was probable cause to conduct a limited search for a VIN number to determine if the car was stolen.

the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas,* 458 U.S. 259, 261 (1982)(citation omitted). "It is thus clear that the justification to conduct a warrantless search does not vanish once the car has been immobilized." *Id.*

The government asserts that Officer Nabors's detection of marijuana odor emanating from the vehicle provided Officer Nabors with probable cause to search the vehicle prior to the time he moved the vehicle. At the hearing, Officer Nabors testified that he smelled marijuana when he first approached Fuchs's vehicle. It is well established in the Sixth Circuit that "an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search." *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002); *see also United States v. Johnson*, 707 F.3d 655, 658 (6th Cir. 2013); *United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008); *United States v. Foster*, 376 F.3d 577, 583-84 (6th Cir. 2004); *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993). The court finds the testimony of Officer Nabors regarding the smell of marijuana emanating from the car to be credible even though he failed to mention the smell of marijuana in his arrest ticket. Fuchs's statement that there may be a "blunt" in the car lends further credence to Officer Nabors's testimony that he smelled marijuana.

15

Fuchs did not call any witnesses, and Officer Nabors's testimony that he smelled marijuana remains uncontroverted. Thus, even if moving the car constitutes a search, Officer Nabors already had probable cause at that point in time to search the vehicle and his actions were justified under the automobile exception to the warrant requirement.

2. *Inventory Search and Inevitable Discovery*

Alternatively, the government argues that even if Officer Nabors lacked probable cause to conduct the search, the inevitable discovery rule deems the evidence admissible. Under the inevitable discovery rule, illegally seized evidence may be admitted despite the exclusionary rule when the government can demonstrate either (1) the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or (2) other compelling facts establishing that the disputed evidence inevitably would have been discovered. *Nix v. Williams*, 467 U.S. 431, 446–48 (1984). "The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *U.S. v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999). Thus, if the government establishes that an inventory search would have occurred following the conclusion of a traffic stop, the inevitable

discovery rule is triggered and the evidence is deemed admissible.

Inventory searches constitute an exception to the warrant requirement. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). This exception permits officers to search vehicles as well as the contents of closed containers within those vehicles, for the purposes of creating an inventory of the contents, so long as the officers conduct such a search pursuant to established procedures and in good faith. *Id.* at 371-72, 374; *see also South Dakota v. Opperman*, 428 U.S. 364, 369 (1970)(stating that the police must follow established standardized procedures when performing the inventory search). The search must be conducted "in good faith, not as a pretext for criminal investigation." *United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007). The true purpose of the search must be to inventory the owner's property while in police custody. *Id.* The justification for inventory searches is based on the community caretaking function, in which vehicles that "jeopardize both the public safety and the efficient movement of vehicular traffic" are taken into police custody. *Opperman*, 428 U.S. at 368-69. Inventory searches also provide protection for the owner's property while in the custody of the police, protection against claims of lost or stolen property, and protection of police from danger. *E.g.*, *Bertine*, 479 U.S. at 372; *Opperman*, 428 U.S. at 369; *Tackett*, 486 F.3d at 232.

17

At the hearing, Officer Nabors testified that Gallaway Police Department procedures dictate that any vehicle driven by an individual lacking a valid driver's license, vehicular insurance, or registration for the vehicle must be impounded. Officer Nabors also explained that it is policy of the Gallaway Police Department to conduct an inventory search of every vehicle that is impounded.[4] Here, the car lacked a license plate, Fuchs could not produce the registration papers, and the officers suspected it to be a stolen vehicle. Fuchs could not have driven it himself because he lacked a valid driver's license. He told the officers he talked to his girlfriend, yet he did not indicate she could drive the vehicle and she did not appear at the scene to claim the vehicle.

Additionally, Officer Nabors testified that the VIN number on the driver's side door of the vehicle was painted over or altered in a way that made it impossible to read. Pursuant to Tenn. Code Ann. § 55-5-108(b)(1), Officer Nabors had a duty to seize and impound the vehicle. As the Sixth Circuit explained, Tenn. Code Ann. § 55-5-108(b)(1) dictates that "any automobile from which the vehicle identification number has been removed is declared to be contraband and subject to forfeiture to the state." *Fann v.*

---

[4] The government advised the court at the hearing that the Gallaway Police Department does not have a written towing policy.

*Buick Motor Co., a Div. of Gen. Motors Corp.*, 995 F.2d 1066 (6th Cir. 1993).   Thus, "[w]hen Tennessee law enforcement officers have reason to believe that property constitutes contraband under this section, the statute says that it is their duty to impound the property." *Id.*

The officers properly decided to impound the vehicle. If the Gallaway Police had conducted a routine inventory search of the vehicle following impoundment, the search more than likely would have led to the discovery of the methamphetamine.   Accordingly, the court finds that even if Officer Nabors did not have probable cause to search Fuchs's vehicle at the time he moved the vehicle, the inevitable discovery doctrine would apply to prevent the exclusion of the fruits of Officer Nabors's search.

Because the court finds that Officer Nabors's actions were justified under the automobile exception to the warrant requirement as well as the doctrine of inevitable discovery as set forth below, it is unnecessary to determine whether moving a detained individual's vehicle during a traffic stop constitutes a "search" under the Fourth Amendment.

C.   The Drug Dog's Alert

Fuchs also argues that Officer Nabors failed to adequately describe with the necessary specificity how his narcotics-detection canine alerts Officer Nabors to the presence of narcotics.   Specifically, Fuchs argues that Officer Nabors's

testimony that a "change in behavior" is his dog's way of alerting him to the presence of narcotics is too broad to qualify as a valid alert.    Whether Officer Nabors's narcotics-detection canine adequately alerted him to the presence of narcotics in Fuchs's vehicle is a finding of fact contingent on the credibility of the testimony given at the suppression hearing.

A court is given wide latitude in making its credibility determinations. *United States v. Haynes,* 301 F.3d 669, 679 (6th Cir. 2002)(citing *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 573-75 (1098)).    "In assessing credibility, a court considers numerous factors, ultimately relying on the common-sense tests of reason and logic." *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015).    However, the court does not have unlimited discretion, and a court may not credit a witness's testimony if documents or other objective evidence contradict the witness's story; or the story itself is "'so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.'" *Haynes*, 301 F.3d at 679-80 (quoting *Anderson*, 470 U.S. at 575)).

In this case, Officer Nabors's account of the events surrounding the dog sniff is corroborated by the body-camera footage and the Affidavit of Complaint.    There was no expert testimony presented to the court concerning the manner in which drug detection dogs alert passively. Further, Fuchs did not call

any witnesses or provide any evidence to refute Officer Nabors's
testimony. Accordingly, the court finds that Officer Nabors's
testimony regarding his narcotics-detection canine's training and
methods for alerting Officer Nabors to the presence of narcotics
is credible and that Kilo, Officer Nabors's drug dog, alerted on
the presence of narcotics in the vehicle.

  D. *Miranda* Warnings

  Finally, Fuchs argues that his statements made in response
to the officers' questioning were unconstitutionally coerced and
should therefore be suppressed. It is undisputed that Fuchs was
not provided with a *Miranda* warning during the traffic stop. The
government concedes that Fuchs's statements while he was in the
squad car made after the methamphetamine was discovered are
inadmissible, but the government maintains that Fuchs's
statements made after he was initially detained and before the
methamphetamine was discovered were "pre-arrest statement(s)" and
are therefore admissible. (Gov't's Resp. 11, ECF No. 25.)

  *Miranda* requires that before a person in custody is
questioned, he be advised of his Fifth Amendment right to remain
silent, that anything he says may be used against him, and that
he has a right to have an attorney, either retained or appointed,
present during interrogations. *Miranda v. Arizona*, 384 U.S. 436,
444 (1966). If the defendant is not informed of these rights,
any pretrial statement obtained in a custodial interrogation is

presumed coerced and inadmissible at trial in the government's case in chief. *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

The clear rule is that "[w]hen police ask questions of a suspect in custody without administering the required warnings, *Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the [government's] case in chief." *Elstad*, 470 U.S. at 317. The "right" to *Miranda* warnings is not constitutionally mandated. *Michigan v. Tucker*, 417 U.S. 433, 444 (1974). Rather, the warnings are intended as a prophylactic mechanism to safeguard against the inherently coercive effects of in-custody interrogation which threaten the Fifth Amendment privilege. *New York v. Quarles*, 467 U.S. 649, 654 (1984).

*Miranda* warnings are required only when a suspect is in custody and subject to interrogation. *U.S. v. Luck*, 852, F.3d 615, 621 (6th Cir. 2017). Custody is defined as the "[deprivation] of . . . freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "Interrogation" means "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980). "[T]he temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop . . . does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010)(citations omitted). Further, "[a]n officer's inquiries into matters unrelated to the

justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as the inquiries do not measurably extend the stop's duration." *Arizona v. Johnson*, 555 U.S. 323, 325 (2009). "[T]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond." *Berkemer v. McCarty*, 468 U.S. 420, 422 (1984). "[I]t is not unreasonable to ask questions unrelated to a traffic stop when the officer has reasonable suspicion and when he is not finished with the tasks required to complete the stop." *United States v. Garrido-Santana*, 360 F.3d 565, 573 (6th Cir. 2004). However, if "the question is directly tied to the officer's attempt to further the investigation and cannot be described as related to safety or administrative concerns because [the] [d]efendant was already placed in handcuffs and removed from the vehicle," then the question is inherently "reasonably likely to elicit incriminating information and, therefore, could be construed as custodial interrogation." *United States v. Johnson*, No. 2:17-CR-20382-JTF-1, 2018 WL 5846348, at *3 (W.D. Tenn. Nov. 8, 2018). Further, if *Miranda* protections apply, "no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.'" *Miranda*, 384 U.S. at 476-77.

The government argues that Officer Nabors's questions fell within the limited scope of questions an officer may ask before reading a defendant his *Miranda* rights. (Gov't's Resp. 10, ECF No. 25.) As explained above, Officer Nabors lawfully removed Fuchs from the vehicle and placed him in handcuffs. While Fuchs was handcuffed, he was questioned about the ownership of the vehicle and the presence of illegal drugs. Because the officers had patted Fuchs down, handcuffed him, and did not tell him he was free to leave or free to refuse to answer questions, he was effectively placed in custody. Officer Nabors's questions regarding stolen vehicles and the presence of illegal drugs in the vehicle "cannot be described as related to safety or administrative concerns because [Fuchs] was already placed in handcuffs and removed from the vehicle." *Johnson*, 2018 WL 5846348 at *3. Rather, these questions were "reasonably likely to elicit incriminating information and, therefore, could be construed as custodial interrogation." *Id.* Accordingly, this court finds that any statements made while Fuchs was handcuffed are inadmissible.

### III. RECOMMENDATION

For the reasons expressed above, it is recommended that Fuchs's motion to suppress any physical evidence collected during the traffic stop be denied and that Fuchs's motion to suppress

24

the statements he made in response to police interrogation while

he was handcuffed be granted.

Respectfully submitted this 3rd day of April, 2019.

_/s/ Diane K. Vescovo_____
DIANE K. VESCOVO
Chief United States Magistrate Judge


NOTICE

Any objections or exceptions to this report must be filed within
fourteen (14) days after being served with a copy of the report.
28 U.S.C.   636(b)(1)(C).   Failure to file them within fourteen
(14) days may constitute a waiver of objections, exceptions, and
any further appeal.  Any party objecting to this report must make
arrangements for a transcript of the hearing to be prepared.