**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                                              No. 18-cr-20400-MSN-dkv

ZACHARY FUCHS,

      Defendant.

---

### ORDER ADOPTING IN PART REPORT AND RECOMMENDATION AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS

---

Defendant moves to suppress (1) evidence found in the vehicle he was driving during a search of the vehicle conducted by the Gallaway Police Department after a traffic stop; and (2) statements he made in response to police interrogation while he was handcuffed during that traffic stop. (ECF No. 19.) After an initial hearing, Chief Magistrate Judge Vescovo entered her Report and Recommendation on Defendant's Motion to Dismiss ("Report") on April 3, 2019. (ECF No. 32.) The Report recommended denying the motion as to suppression of the physical evidence collected during the traffic stop and granting the motion as to the statements Defendant made while handcuffed. (ECF No. 32 at PageID 81–82.) Defendant filed a combined motion seeking to re-open proof on his motion to suppress and making objections to the Report on May 1, 2019. (ECF No. 35.) In his motion, Defendant asserted that his counsel had discovered evidence that undermined the credibility of the government's only witness at the initial hearing, Officer David Nabors, who had conducted the traffic stop and the search of the vehicle. (*Id.* at PageID 87–88.)

Defendant requested this Court to re-open the proof or to hold a *de novo* hearing on the matter. (*Id.*) The government responded on May 14, 2019. (ECF No. 37.) This Court granted Defendant's motion to the extent it sought a *de novo* hearing and held the hearing on September 6, 2019.

Upon consideration of the record as developed at the hearing before Chief Magistrate Judge Vescovo and the *de novo* hearing, this Court **ADOPTS** the Report in part, and **GRANTS** in part and **DENIES** in part Defendant's Motion to Suppress.

## BACKGROUND

### I.    Suppression Hearing Before Chief Magistrate Judge Vescovo

At the hearing before Chief Magistrate Judge Vescovo, the government called one witness, Officer David Nabors, and introduced two exhibits into evidence: (1) the Affidavit of Complaint for Fuchs' arrest; and (2) a disc containing a video of Officer Nabors' body camera footage during the traffic stop and subsequent arrest. (ECF No. 29; ECF No. 32 at PageID 59.) Defendant did not call any witnesses or introduce any exhibits. (*Id.*) As described below, most of the traffic stop at issue was recorded via Officer Nabors' body-worn camera.

Officer Nabors testified that he initiated the stop of Defendant's vehicle on June 6, 2018 at approximately 11:00 a.m. because the vehicle did not have a license plate. (ECF No. 32 at PageID 60.) Officer Nabors pulled behind the vehicle and activated his lights and siren as the vehicle pulled into the parking lot of private business, Crystal Steel. (*Id.*) Officer Nabors made contact with Defendant, who was the driver and only person in the vehicle. (*Id.*) Officer Nabors testified that Defendant was initially combative and accused Officer Nabors of taking his license plate. (*Id.*) Defendant provided Officer Nabors with his name, birthdate, and social security number but admitted that he did not have a driver's license, vehicle registration, or proof of insurance. (*Id.* at PageID 60–61.) Officer Nabors testified that it was the policy of the Gallaway Police Department

to tow any vehicle drive by an individual lacking a valid driver's license, vehicular insurance, or registration. (*Id.* at PageID 75.) Officer Nabors testified that he detected the odor of marijuana during this initial contact with Defendant. (*Id.* at PageID 61.) However, Officer Nabors failed to include this information in the Affidavit of Complaint. (*Id.*)

After this initial contact with Defendant, Officer Nabors returned to his vehicle, called Chief James Mayes[1] for backup, and because Fayette County dispatch was down at the time, called the El Paso Intelligence Center ("EPIC") to run the Defendant's information. (*Id.* at PageID 60.) From this point forward, there is body camera footage of the traffic stop. (*Id.* at PageID 61.) Officer Nabors testified that while sitting in his patrol car during this time, he noticed that the flashlight on his body camera was on and realized he had mistakenly turned the flashlight on instead of the camera when he initiated the traffic stop. (*Id.*) Upon realizing his mistake, Officer Nabors activated his body camera. (*Id.*)

After providing EPIC with Defendant's information, Officer Nabors was advised that Defendant had a prior conviction for manufacturing and attempting to manufacture methamphetamine, that Defendant allegedly carried a handgun, and that Defendant had previously been charged with stealing a vehicle during the commission of a theft. (*Id.* at PageID 62.) While Officer Nabors was on the phone with EPIC, Chief Mayes arrived on the scene and approached Defendant's vehicle. (*Id.*) Shortly thereafter, Officer Nabors can be heard on the body camera footage telling EPIC that he would call them back, but that he needed to get Defendant out of the car and secure him because Defendant was moving around and reaching under his seat. (*Id.*) Officer Nabors testified that based on the information he received from EPIC and his observations

---

[1] At the time of the traffic stop, Chief Mayes was a Captain with the Gallaway Police Department, but he has since been promoted to Chief.

of Defendant's movements, he decided it was necessary at that time to detain Defendant for officer-safety purposes. (*Id.*)

Officer Nabors proceeded to exit his vehicle and approached Chief Mayes and Defendant, who was sitting in the vehicle with the door shut and the window down talking on his cell phone. (*Id.*) Officer Nabors directed Defendant to step out of the vehicle. (*Id.*) Defendant complied and asked Officer Nabors if he was under arrest. (*Id.*) Officer Nabors told Defendant he was not under arrest but that he was going to detain Defendant. (*Id.*) After handcuffing Defendant, Officer Nabors questioned him about the owner of the vehicle, whether it was stolen, and if Defendant had ever stolen a vehicle before. (*Id.* at PageID 63.) Officer Nabors continued to question Defendant, specifically asking him if there was anything illegal in the car, to which Defendant responded that there "might be half a blunt or something." (*Id.*) Defendant denied several more times that there was anything illegal in the vehicle in response to Officer Nabors continued questioning. (*Id.* at PageID 63–64.)

While Officer Nabors was questioning Defendant, Chief Mayes can be seen lifting the hood of the vehicle. Officer Nabors testified that he could not testify as to what Chief Mayes was doing, but that he believed Chief Mayes was likely attempting to find a vehicle identification number ("VIN") because they suspected the vehicle may have been stolen. (*Id.* at PageID 64.) Officer Nabors further testified that the VIN number in the door jamb of the driver's door was painted over or altered in a way that made it impossible to read. (ECF No. 32 at PageID 64.)

After closing the vehicle's hood, Chief Mayes walked around the back of Defendant's vehicle and instructed Officer Nabors to move the vehicle. Officer Nabors testified that it was necessary to move the vehicle because it was blocking the entrance to the business, and a semi-truck was trying to get by. On the body camera footage, Officer Nabors can be seen moving his

police vehicle out from behind Defendant's vehicle and then forward, and then similarly moving Defendant's vehicle forward. After moving Defendant's vehicle, Office Nabors rolled up the driver's side window. Officer Nabors testified that he rolled the window up in order to confine the odor of marijuana inside the vehicle to increase the chance of his narcotics detection canine, "Kilo," accurately alerting to the presence of narcotics. (ECF No. 32 at PageID 65.)

After moving Defendant's vehicle, Officer Nabors retrieved Kilo from his vehicle and began walking Kilo around Defendant's vehicle. Officer Nabors testified that Kilo passively alerts to the presence of narcotics by sitting, changing his breathing pattern, or generally changing his behavior. (ECF No. 32 at PageID 65.) As Officer Nabors walked Kilo around the vehicle, Kilo sat near the driver's side door and then sat again after jumping on the rear bumper of the vehicle. Officer Nabors testified that he identified both of these actions as alerts to the presence of narcotics. (ECF No. 32 at PageID 65.) Thereafter, Officer Nabors returned Kilo to his police vehicle, and Officer Nabors and Chief Mayes began searching Defendant's vehicle.

During the search of the vehicle, Officer Nabors initially found a plastic bag underneath the driver's seat that had a white residue, a roll of packaging tape, and plastic gloves. Continuing the search, Officer Nabors found a bag containing 1.1 pounds of methamphetamine hidden behind a tray in the center dash console.

## II.     *De Novo* Suppression Hearing

At the *de novo* hearing, the two exhibits from the initial hearing (*see* ECF Nos. 29 & 32) were made part of the record for the *de novo* hearing, and the government introduced two additional exhibits: (1) the certification sheets and K9 training logs for Kilo; and (2) a photograph of the rear of the vehicle Defendant was driving taken from Officer Nabors' body camera footage. (ECF No. 46.) Defendant introduced one exhibit, the state court transcript from the hearing on his

motion to suppress in the Circuit Court of Tennessee at Somerville. (*Id.*) The government called Officer Nabors to testify again, and Defendant called one witness, Chief James Mayes of the Gallaway Police Department.

Officer Nabors' testimony at the *de novo* suppression hearing was consistent with his testimony at the initial hearing before the Magistrate Judge, except as to the topic of the VIN number of Defendant's vehicle. At the initial suppression hearing, Officer Nabors testified that the VIN number of the vehicle had been painted over or altered in a way that made it impossible to read. At the *de novo* hearing, Officer Nabors testified that his statement at the initial hearing was based on a conversation he had with someone at the Gallaway Police Department once the vehicle had been impounded. Officer Nabors stated that he did not look for the vehicle's VIN number during the traffic stop, and his testimony at the initial hearing that the VIN number had been painted over was not based on personal knowledge.

Chief Mayes, who provided backup to Officer Nabors during the traffic stop of Defendant, also testified at the *de novo* hearing. Chief Mayes testified that in June of 2018, he was a Captain at the Gallaway Police Department. Chief Mayes' testimony at the *de novo* hearing contradicts Officer Nabors' testimony in several respects.

First, Chief Mayes testified that he believed it was improbable that Officer Nabors had accidentally hit the flashlight button on his body camera instead of the button to record. Chief Mayes stated that there were other occasions in which Officer Nabors did not start his body camera at the beginning of a traffic stop.

Second, Chief Mayes testified that he did not smell marijuana when he approached Defendant's vehicle, and he was surprised to learn that Officer Nabors testified that he had smelled marijuana. On cross examination, Chief Mayes acknowledged that he had made traffic stops

during which he detected the smell of marijuana but ultimately there was no marijuana found in the vehicle.

Additionally, Chief Mayes testified that he disagreed with Officer Nabors using Kilo as a police canine because Kilo was not owned by the Gallaway Police Department. During cross examination, Chief Mayes testified that it is not unusual for a canine handler to take his animal home with him, and the only factor that was different with Officer Nabors and Kilo was that Officer Nabors owned Kilo. As to the traffic stop of Defendant, Chief Mayes testified that while Officer Nabors was running Kilo around Defendant's vehicle, he spoke with Defendant and told him that Kilo was first going to urinate on his tire, and then Kilo would sit because Officer Nabors told him to sit. Chief Mayes testified that he had observed Kilo urinate on tires before alerting during prior traffic stops. Chief Mayes further testified that he observed instances when Kilo had alerted but no drugs were found, but the Gallaway Police Department did not keep records of these apparent false positive alerts.

Finally, Chief Mayes testified that he was looking for the VIN number when he lifted the vehicle's hood, and the VIN number on the vehicle was in fact legible, although it was somewhat difficult to read. There was no testimony regarding whether Chief Mayes spoke with Officer Nabors regarding the VIN number, either during or after the traffic stop.

Chief Mayes' testimony also corroborated Officer Nabors' testimony in several respects. Chief Mayes confirmed that the Gallaway Police Department did not have any written policies at the time of the traffic stop, and that since he became Chief, they have started working on implementing written policies. Despite the lack of written policies, Chief Mayes' testimony corroborated Officer Nabors regarding the Gallaway Police Department's towing policy and inventory searches upon impoundment of a vehicle. Chief Mayes also stated that he agreed with

the decision to tow the vehicle and that it was his opinion that the methamphetamine would have been found during an inventory search of the vehicle.

There was also testimony from Chief Mayes regarding matters that were not directly related to the traffic stop of Defendant. Chief Mayes testified that he opposed Officer Nabors' hiring because of he had several misdemeanors on his record. Chief Mayes also testified that when Officer Nabors left the Gallaway Police Department, his personnel file went missing.

## STANDARD OF REVIEW

A district court has the authority to "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion." 28 U.S.C. § 636(b)(1)(B). The district court has appellate jurisdiction over any decisions the magistrate judge issues pursuant to such a referral. 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(a).

The standard of review the district court applies depends on the nature of the matter considered by the magistrate judge. "[U]pon proper objection by a party, a district court must review *de novo* a magistrate judge's ruling on a motion to suppress." *United States v. Quinney*, 238 F. App'x 150, 152 (6th Cir. 2007) (citing 28 U.S.C. § 636(b)(1)); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001)). The Court need not review—under a *de novo* or any other standard—those aspects of a report and recommendation to which no objection is made. *Thomas v. Arn*, 474 U.S. 140, 150–52 (1985). Objections to any part of a magistrate judge's disposition "must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *see also Arn*, 474 U.S. at 147 (stating that the purpose of the rule is to "focus attention on those issues . . . that are at the heart of the parties' dispute."). A general, frivolous, or conclusory objection will be treated as if no

objection had been made. *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991); *see also Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) ("[T]he district court need not provide *de novo* review where the objections are '[f]rivolous, conclusive or general.'" (internal quotation marks omitted)).

## DISCUSSION

Defendant's Motion to Suppress seeks suppression of the physical evidence, including 1.1 pounds of methamphetamine, discovered during the traffic stop and of the statements he made in response to Officer Nabors' questioning. (ECF No. 23 at PageID 33–39.) In her Report, Chief Magistrate Judge Vescovo recommends denying Defendant's motion as to the physical evidence and granting Defendant's motion as to the statements made in response to Officer Nabors' questioning.

Neither the United States nor Defendant have objected to the Chief Magistrate Judge's findings and recommendation regarding suppression of statements Defendant made while handcuffed. The Court has reviewed the Report's findings of fact and conclusions of law regarding suppression of Defendant's statements for clear error and finds none. Accordingly, the Court **ADOPTS** the Report as to suppression of Defendant's statements made while handcuffed, and Defendant's Motion to Suppress is **GRANTED** to the extent it seeks suppression of those statements.

As to the Report's findings of fact and conclusions of law on suppression of the physical evidence, Defendant objects to nearly all the factual findings and conclusions of law. (ECF No. 35 at PageID 88–92.) Defendant's objections to the factual findings generally go to the credibility of Officer Nabors and are based on the inconsistencies his counsel alleges he discovered when he further investigated this matter after the initial suppression hearing. Defendant's objections to the

conclusions of law do not argue that the Magistrate Judge applied incorrect law or that her application of the law was flawed, but instead seem to be continued objections to the Magistrate Judge's findings of fact and her credibility determination. This Court granted Defendant's request for a *de novo* hearing to allow Defendant to present evidence regarding the inconsistencies his counsel alleged he discovered. The Court addresses each of Defendant's arguments for suppression below.

## I. <u>Traffic Stop and Excessive Intrusion</u>

First, Defendant challenges the validity of the initial traffic stop by Officer Nabors.[2]

If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993), *cert. denied*, 513 U.S. 828 (1994). Like other Fourth Amendment issues, whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. *Id.* at 388; *see Whren v. United States*, 517 U.S. 806, 810 (1996) (holding that "[a]s a general matter, the decision to stop an automobile is reasonable [within the meaning of the Fourth Amendment] where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (holding that "[a] police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct"). Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more

_____

[2] The Report states that at the conclusion of the initial hearing, Defendant conceded the initial traffic stop was valid (ECF No. 32 at PageID 66), but at the *de novo* hearing, Defendant's counsel implied otherwise, suggesting that the Court should consider Defendant's assertion that Officer Nabors had removed Defendant's license plate.

than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *Ferguson*, 8 F.3d at 392 (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

Officer Nabors testified at both the initial hearing and the *de novo* hearing that he initiated the traffic stop because he observed Defendant's vehicle traveling without a license plate. This testimony is corroborated by Officer Nabors' body camera footage, which shows the rear of Defendant's vehicle with no license plate present. (*See* Exhibit 5.) Even though Officer Nabors' body camera footage begins several minutes after the traffic stop was initiated, the Court finds Officer Nabors' testimony regarding the vehicle's lack of a license plate when he first observed the vehicle credible, and Defendant's suggestion that Officer Nabors was responsible for removing the license plate not credible. The Court therefore finds that Officer Nabors lawfully stopped the vehicle driven by Defendant because Officer Nabors had probable cause to believe that the driver had committed a traffic violation by failing to attach and display a license plate in accordance with Tenn. Code Ann. § 55-1-110.

Defendant also challenges the scope of the traffic stop, arguing that removing Defendant from the vehicle and placing him in handcuffs was excessive for the circumstances of the traffic stop. (ECF No. 23 at PageID 35.)

"An ordinary traffic stop [] is more akin to an investigative detention rather than a custodial arrest, and the principles announced in *Terry* . . . apply to define the scope of reasonable police conduct." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (citing *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996)). "Once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *United*

*States v. Bonilla*, 357 F. App'x 693, 696 (6th Cir. 2009) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977)); *see also United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) (quoting the same).

During a traffic stop, officers may take any measures that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Davis*, 331 F. App'x 356, 360 (6th Cir. 2009) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). The reasonableness of law enforcement's actions during a traffic stop depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Mimms*, 434 U.S. at 109. When an officer fears for his safety, handcuffing an individual is an appropriate safety precaution even if officers are merely detaining, not arresting, the individual. *See U.S. v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007) (citing *Houston v. Does*, 174 F.3d 809, 814 (6th Cir. 1999)). Concern for officer safety far outweighs de minimis intrusions. *Mimms*, 434 U.S. at 109.

At the initial hearing and the *de novo* hearing, Officer Nabors testified that Defendant was combative and appeared nervous. On the body camera footage, Officer Nabors can be heard telling EPIC that Defendant was combative when Officer Nabors first made contact with Defendant. EPIC also informed Officer Nabors that Defendant was alleged to carry a handgun, and while on the phone with EPIC, Officer Nabors observed Defendant moving around and reaching under his seat. This Court finds Officer Nabors' testimony regarding Defendant's combative behavior upon initial contact and his observations of Defendant's movements while he was on the phone with EPIC credible. Based on the foregoing, this Court finds that Officer Nabors' decision to handcuff Defendant was justified as an appropriate safety precaution and was not excessive.

## II. <u>Moving Vehicle as a Search</u>

Defendant next argues that when Officer Nabors moved his vehicle, it was a search in violation of the Fourth Amendment. To determine whether there was a violation of the Fourth Amendment, courts focus on two inquiries: (1) whether the alleged conduct constitutes a search within the meaning of the Fourth Amendment; and (2) whether the search was reasonable. *See Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019).

As the Sixth Circuit recently explained,

> [t]he Supreme Court has articulated two distinct approaches to determine when conduct by a governmental agent constitutes a search. Under the most prevalent and widely-used search analysis articulated in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), a search occurs when a government official invades an area in which "a person has a constitutionally protected reasonable expectation of privacy." *Id.* at 360, 88 S.Ct. 507 (Harlan, J., concurring). Under *Katz*, a search is analyzed in two parts: "first that a person exhibit an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* at 361, 88 S.Ct. 507. A "physical intrusion" is not necessary for a search to occur under *Katz*. *See id.* at 360, 88 S.Ct. 507.
>
> In recent years, however, the Supreme Court revisited the seldom used "property-based" approach to the Fourth Amendment search inquiry in *United States v. Jones*, 565 U.S. 400, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). Under *Jones*, when governmental invasions are accompanied by physical intrusions, a search occurs when the government: (1) trespasses upon a constitutionally protected area, (2) to obtain information. *Id.* at 404–405, 132 S.Ct. 945.
>
> In *Jones*, the government surreptitiously attached a GPS device to a car to track the car's movements. *Id.* at 403, 132 S.Ct. 945. The Supreme Court held that the government's trespass upon an effect—the vehicle—to obtain information related to the car's movement was a search. *Id.* at 404–405. Jones echoed the understanding that the "[t]he *Katz* reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." *Id.* at 409, 132 S.Ct. 945. (emphasis in original).

*Taylor*, 922 F.3d at 332.

The action at issue here, Officer Nabors moving Defendant's vehicle, involves a physical intrusion, and *Jones* therefore provides the appropriate analytical framework for determining whether there was a search within the meaning of the Fourth Amendment. *See id.*

In accordance with *Jones*, the first inquiry is whether entering and moving the vehicle constitutes common-law trespass upon a constitutionally protected area. *See id.* "[C]ommon-law trespass is 'an act which brings [about] intended physical contact with a chattel in the possession of another.'" *Id.* at 332–33 (quoting Restatement (Second) of Torts § 217 cmt. e (1965)). Officer Nabors made physical contact with Defendant's vehicle when he moved it, and thus his actions constitute common-law trespass.

The second inquiry under *Jones* is whether the trespass was "conjoined with . . . an attempt to find something or to obtain information." *Id.* at 333 (quoting *Jones*, 565 U.S. at 408, 132 S.Ct. 945 n.5). Officer Nabors testified that he moved Defendant's vehicle after Chief Mayes asked him to do so, and he explained that the purpose of moving the vehicle was to move it out of the way of a large semi-truck. The Court finds Officer Nabors' testimony regarding why Defendant's vehicle was moved to be credible. Accordingly, although Officer Nabors made a physical intrusion on a constitutionally protected area, because that intrusion was not done with "an attempt to find something or obtain information," the moving of Defendant's vehicle by Officer Nabors does not constitute a search within the meaning of the Fourth Amendment.

Further, even if moving Defendant's vehicle constituted a search, the Court finds that Officer Nabors had probable cause to search the vehicle prior to the time he moved it, justifying the search under the automobile exception to the warrant requirement.

The government has the burden to prove by a preponderance of the evidence that the circumstances justified a warrantless search. *United States v. Matlock*, 415 U.S. 164 n.14 (1974);

*United States v. Bradley*, 163 Fed. Appx. 353, 357 (6th Cir. 2005). Under the automobile exception, an officer may perform a warrantless search of a detained vehicle if the officer has probable cause to believe that the vehicle contains contraband or evidence of criminal activity. *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012). Probable cause exists when there is a fair probability under the totality of the circumstances that contraband or evidence of a crime will be found in a particular place. *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003).

At the initial hearing and the *de novo* hearing, Officer Nabors testified that he smelled marijuana when he initially made contact with Defendant. However, Chief Mayes testified at the *de novo* hearing that he did not detect the odor of marijuana when he approached Defendant's vehicle. The Court also notes that Officer Nabors failed to mention the smell of marijuana in the Affidavit of Complaint, and Officer Nabors' testimony before the Circuit Court of Tennessee at Somerville did not include that he detected of the smell of marijuana when he first approached Defendant's vehicle. Notwithstanding the foregoing omissions, the Court finds Officer Nabors' testimony regarding the smell of marijuana credible. The Court also credits Chief Mayes' testimony that he did not smell marijuana. However, Chief Mayes arrived on the scene sometime after Officer Nabors first made contact with Defendant. During that time, Defendant was in his car with at least two windows down (rear passenger's side and front driver's side), which could have allowed the odor of marijuana to dissipate by time Chief Mayes first approached the vehicle.

As Chief Magistrate Judge Vescovo set forth in the Report,

> [i]t is well established in the Sixth Circuit that "an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search." *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002); *see also United States v. Johnson*, 707 F.3d 655, 658 (6th Cir. 2013); *United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008); *United States v. Foster*, 376 F.3d 577, 583-84 (6th Cir. 2004); *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993).

(ECF No. 32 at PageID 72.)

In accordance with Sixth Circuit precedent, because the Court finds Officer Nabors'

testimony credible regarding the smell of marijuana, probable cause to search Defendant's vehicle

existed at the time Officer Nabors moved Defendant's vehicle. Therefore, even if moving

Defendant's vehicle constituted a search, that search falls within the automobile exception to the

warrant requirement.

## III.   Reliability of Canine, Probable Cause, and Alert Method

Next, Defendant argues that the alerts by the police canine, Kilo, to the presence of

narcotics did not provide probable cause to search the vehicle because there is insufficient evidence

as to Kilo's reliability. Defendant also challenges the credibility of Officer Nabors' testimony

regarding Kilo's process for alerting to the presence of drugs.

"A dog sniff conducted during a . . . lawful traffic stop that reveals no information other

than the location of a substance that no individual has any right to possess does not violate the

Fourth Amendment." *Illinois v. Cabalees*, 543 U.S. 405, 410, 125 S.Ct. 834, 160 L.Ed.2d 61

(2013). A trained police dog's alert to the presence of narcotics can create probable cause for a

subsequent search of the vehicle if "all the facts surrounding a dog's alert, viewed through the lens

of common sense, would make a reasonably prudent person think that a search would reveal

contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248, 133 S.Ct. 1050, 185

L.Ed.2d 61 (2013).

In order to establish probable cause, the dog's alert must have been reliable, which may be

demonstrated by evidence of the dog's training and certification. *United States v. Patton*, 517 F.

App'x 400, 402–03 (6th Cir. 2013). Evidence of dog's satisfactory performance in a certification

program by itself is "sufficient reason to trust his alert." *Harris*, 568 U.S. at 246, 133 S.Ct. 1050.

"If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a

court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Id.* at 246–47, 133 S.Ct. 1050. "A defendant . . . must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witness." *Id.* at 247, 133 S.Ct. 1050.

Officer Nabors testified that Kilo was certified as a narcotics detection dog in 2017 and 2018, and the government introduced records of Kilo's certifications and training logs from 2017 and 2018. (*See* Exhibit 3 (collective).) At the *de novo* hearing, Officer Nabors testified that he trained with Kilo every other week. Defendant's counsel cross-examined Officer Nabors regarding Kilo's certification and Kilo's training. Defendant did not present any evidence contradicting the certification or training of Kilo. Chief Mayes testified about his observations of Kilo, stating that Kilo would typically urinate on a vehicle's tire before he began sniffing around a vehicle. He also testified that he had observed Kilo alert on vehicles in which no narcotics were found. There was also testimony from Officer Nabors and Chief Mayes that there were no records of Kilo's performance in the field.

In performing its totality of the circumstances analysis, the Court also considers Defendant's argument that Kilo's alert does not constitute probable cause because Officer Nabors told Kilo to sit. The Court carefully reviewed the relevant portion of the body camera footage and considered whether Officer Nabors gave Kilo any cues, purposely or inadvertently, to sit or alert. Officer Nabors testified at the initial hearing and the *de novo* hearing that he commands Kilo to sit before he begins his work so that he is focused, and then he gives him the command to begin. On the body camera footage, Officer Nabors can be heard telling Kilo to sit several times before giving him the command to begin. Thereafter, the only verbal cues Officer Nabors gives Kilo come after Kilo sits for the first time near the driver's side door, when Officer Nabors tells him "good." As

Kilo continues around the vehicle, Officer Nabors can be heard calling Kilo's name and again giving him the command to begin shortly before Kilo sits behind the rear of the vehicle.

Based on the testimony and evidence developed at the initial hearing and the *de novo* hearing, the Court finds that there is ample evidence to support Kilo's reliability and that there was probable cause to search the vehicle. The certifications and training records for Kilo are uncontroverted evidence of his reliability. Although Chief Mayes' testimony supports that there may be a pattern regarding Kilo's behavior (urinating on vehicles) before he begins his work, that does not undermine the evidence of his certification and reliability. Further, the body camera footage does not support Defendant's argument that Kilo's performance of his alert behavior, sitting, was in response to a cue by Officer Nabors. Finally, the Court also considers the absence of field records and Chief Mayes' testimony regarding what appear to be false positives in performing its totality of the circumstances analysis; however, that evidence (or lack of) is not enough to justify a finding that Kilo is not reliable because a dog's field performance has "relatively limited import." *Harris*, 568 U.S. at 246. As the Supreme Court explained,

> [e]rrors may abound in such records. If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely . . . if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where drugs are hidden and where they are not— and so where a dog should alert and where he should not. The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.

*Id.* at 245–46.

For the reasons discussed above, the Court finds that Kilo's positive alert constituted probable cause to search Defendant's vehicle.

Additionally, the Court finds credible Officer Nabors' testimony as to the manner in which Kilo alerts to the presence of drugs. Officer Nabors testified that Kilo is a "passive alert dog," and that he sits when he detects the odor of drugs. Officer Nabors testified that prior to Kilo sitting, he will change his behavior when he is detecting odor. For example, he changes his breathing by breathing through his nose instead of his mouth. Officer Nabors testified that when he began working Kilo around Defendant's vehicle, he could immediately tell that Kilo was "on odor" because he changed his breathing in this manner, and Kilo's body language showed he was excited.

Generally, a drug detection dog is trained to alert in one of two ways: aggressive alert or passive alert. *United States v. Johnson*, 323 F.3d 566, 567 (7th Cir. 2003) (citing Sandy Bryson, Police Dog Tactics 257 (2d ed. 2000)). An aggressive alert dog will alert by performing behaviors such as biting or scratching at the odor source. *Id.* A passive alert dog will alert by performing behaviors such as sitting, looking at the odor source, sniffing toward the source, or looking at the handler. *Id.* Prior to an alert, some drug detection dogs will "perform something less than an alert when encountering certain stimuli. This is sometimes referred to as 'casting.'" *U.S. v. Wilson*, 995 F. Supp. 2d 455, 474 (W.D.N.C. 2014).

Officer Nabors' testimony here describes both "casting" and an "alert" response from Kilo.[3] Sitting is a common alert type for passive alert drug detection dogs. *See Johnson*, 323 F.3d at 567. The Court finds Officer Nabors' testimony regarding the method in which Kilo alerts to

---

[3] Because Kilo performed his passive alert behavior, sitting, this Court is not addressing whether "casting" behavior alone is sufficient to provide probable cause. *See United States v. Rivas*, 157 F.3d 364 (5th Cir. 1998); *see also United States v. Parada*, 577 F.3d 1275 (10th Cir. 2009).

be credible. According to Officer Nabors' testimony, Kilo displayed typical "casting" behavior, followed by his alert behavior. There was no testimony or other evidence presented that contradicts Officer Nabors' testimony, and his testimony itself is not "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *U.S. v. Haynes*, 301 F.2d 669, 679–80 (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–75 (1985)).

## IV.    Gallaway Police Department Tow Policy and Inevitable Discovery

Finally, the government argues that even if Officer Nabors did not have probable cause to search the vehicle, the physical evidence should not be suppressed pursuant to the inevitable discovery rule. In response, Defendant asserts that the inevitable discovery rule should not apply because the Gallaway Police Department did not have a written tow policy and therefore the officers had unfettered discretion in determining whether to tow a vehicle.

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment . . . ." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)). The inevitable discovery rule is an exception to the exclusionary rule and allows unlawfully seized evidence to be admitted when the government can demonstrate by a preponderance of the evidence either (1) the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence, or (2) other compelling facts establishing that the disputed evidence inevitably would have been discovered. *Id.* at 500.

The government asserts that Defendant's vehicle was going to be impounded at the conclusion of the traffic stop because Defendant did not present a valid driver's license, vehicular insurance, or registration for the vehicle, and therefore, the methamphetamine would have been

discovered pursuant to an inventory search of the vehicle upon impoundment. (ECF No. 25 at PageID 48–49; ECF No. 37 at PageID 107.)

An inventory search of a vehicle conducted without a warrant does not violate the Fourth Amendment. *Colorado v. Bertine*, 479 U.S. 367, 371-74 (1987). Warrantless inventory searches may be conducted when police lawfully take custody of a vehicle. *Smith*, 510 F.3d 641, 651 (6th Cir. 2007). An inventory search of a vehicle must be conducted "according to standard police procedures" and may not be undertaken "for purposes of investigation." *United States v. Lumpkin*, 159 F.3d 983, 987 (6th Cir. 1998); *see also United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007). The standard police procedures need not be set forth in a written policy; an officer's testimony alone is sufficient to establish the "existence and contours" of a police department's practices regarding the impoundment of vehicles. *Tackett*, 486 F.3d at 233; *see also United States v. Ballard*, 432 F. App'x 553, 556–57 (6th Cir. 2011); *United States v. Duncan*, 763 F.2d 220, 224 (6th Cir. 1985).

At the *de novo* hearing, Officer Nabors and Chief Mayes both testified that it was the policy of the Gallaway Police Department to tow vehicles that lacked registration, vehicular insurance, or a licensed driver. Officer Nabors testified that he believed the tow policy was a written policy because it was practiced consistently during his time with the department. Chief Mayes testified that the tow policy was not in fact written, but that officers were told to tow vehicles if the driver did not have a license or insurance. Chief Mayes testified that at times officers could use their discretion in arranging for someone else to pick up a vehicle. Officer Nabors and Chief Mayes both testified that the policy of the Gallaway Police Department was to inventory the contents of the vehicle once the vehicle was towed to the department's impound lot.

The Court finds that the government has satisfied its burden under the inevitable discovery rule. Defendant's vehicle would have been towed even absent the search of the vehicle because Defendant lacked a valid driver's license, vehicular insurance, and registration, and the policy of the Gallaway Police Department was to tow vehicles under such circumstances. Even though the policy was unwritten, the uncontroverted testimony of both Officer Nabors and Chief Mayes is enough to establish the "existence and contours" of the policy. *See Tackett*, 486 F.3d at 233. Although officers may have had discretion to allow a third-party to pick up the vehicle, the record does not support that this amounted to unfettered discretion, especially where, as here, not only did the driver lack a valid driver's license, but there was no license plate, registration, or insurance for the vehicle. Once the vehicle was impounded, the Gallaway Police Department would have conducted a routine inventory of the vehicle, and it is likely the methamphetamine would have been discovered during that inventory. Accordingly, the Court finds that the inevitable discovery rule prevents exclusion of the methamphetamine even if Officer Nabors lacked probable cause to search the vehicle.

## CONCLUSION

Based on the foregoing, the Court **ADOPTS** the Report as to the statements made by Defendant while handcuffed, and Defendant's motion to suppress is **GRANTED** as to suppression of those statements. To the extent Defendant's motion to suppress seeks to have the physical evidence excluded, it is **DENIED**.

**IT IS SO ORDERED**, this 30th day of September, 2019.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE